GRIFFIN, J.,
dissenting.
When I first learned that the original dissent had garnered enough votes to become the majority opinion in this case, I was concerned that the decision might do real damage to the law of beneficial ownership under Florida’s dangerous instrumentality doctrine. After some thirty-seven years of using the principles announced in 1955 by the Florida Supreme Court in Palmer v. R.S. Evans, Jacksonville, Inc., 81 So.2d 635 (Fla.1955), and applying those principles as an appellate judge, the law had seemed relatively straightforward and clear. The issue is beneficial ownership. If there is a dispute about whether the person whose name was on the title was also the beneficial owner, evidence would have to be taken to determine all the facts. The standard jury instruction has seemed to work well and without controversy. Fortunately, the majority opinion is so narrow, and the fact plattern on which it is based so unlikely ever again to be repeated in nature, that I don’t think the en banc opinion does any real harm to the law in this area. What it does to Mr. Christensen [Robert] is another matter. He is now on the hook for a multi-million dollar damage award arising out of an accident involving a vehicle that, as the jury found, he did not own, and, accordingly, had lacked the imagination to insure. He did not own the car because two years earlier he had made a gift of the car to his wife. All the requisites for a gift had been met: he intended to give her the car, he delivered possession, dominion and control to her, and he never attempted to exercise any dominion or control over the vehicle ever again.
There is nothing in the record to suggest that Mary Taylor-Christensen’s [“Mary”] beneficial ownership of the car was ever even contested below. The only fact ever proposed by Mary Jo Bowen [“Bowen”] during the trial to suggest that Robert had more than “naked legal title” was the fact that he took the car to the car wash the day after the purchase. Robert’s trial testimony was accordingly very *146 short.[11] He briefly described his intent to make a gift of the car to Mary, Mary’s taking possession of the car and his lack of access or control thereafter. According to the record, Robert had testified in an affidavit and during his deposition that he had not removed his name from the title because he had not realized he was on the title but, at trial, the subject did not come up. At trial, the legal position of the appellants was that Mary’s beneficial ownership did not matter, and because this case did not involve a conditional sale, Robert’s naked legal title alone was enough for liability under the dangerous instrumentality doctrine. The argument made below was that, as a matter of law, Robert had the right to exercise dominion and control over the vehicle at the time of the accident simply because he was on the title. This argument fails in many ways, but the most basic is that Robert no longer had the right of control because, as the jury found, he did not own the car. Title or no title, once Robert gave the car to Mary, he was no longer a joint owner, and he no longer had any legal right to the car. He couldn’t wash it, drive it, sell it or do anything else to it without Mary’s consent because he had given up beneficial ownership. If he had tried to exercise any dominion or control, Mary would have had the right to enforce the gift and to vindicate her ownership by removing his name from the title through judicial means, if necessary.
As I understand it, the principle of law established in the majority opinion is as follows: Where A and B appear at an automobile dealership for the purpose of selecting a car for A to purchase as a gift for B, AND where A and B execute the purchase documents, including an application for joint title, THEN, as a matter of law, A’s gift to B can only be a co-ownership interest in the car, not the entire car. [For convenience, I will refer to this as the “half-a-car” or “HAC theory”].
The first problem with the HAC theory is that it was never raised below or by the parties on appeal. The issue that was tried to the jury was whether Robert was an owner of the car at the time of the accident. The jury had all the purchase documents and the testimony and it found Robert was not an owner of the car at the *147 time of the crash. The theory under which the Plaintiffs proceeded in the case below was that it did not matter whether Mary was the beneficial owner of the car or that Robert had relinquished any power of dominion or control over the car. As Bowen’s counsel argued to the court on the motion for directed verdict:
[OJwnership and vicarious liability go with record title ownership, and it doesn’t matter about all these other things as the cases I’ve pointed out to the court, all other indicias of ownership because the title gives them the right to do with the vehicle what they will. Now, the exception only being when the title is a conditional sales situation[12]
(Emphasis added.) The majority says that the “only evidence of words used by [Robert] manifesting an intent to make a gift was in the documents he signed when he acquired the vehicle from the dealer” and the documents evince only an intent to gift a co-ownership in the vehicle. But that manifestly is not true. The paperwork for the purchase of the car had nothing to do with the gift. The purpose of the documents was to effect a sale of the car. A signature on an application for title as joint owner does not say gift, or gift of half or anything at all about what Robert intended to do with the car. From the documents, it is impossible to know what the deal was between Mary and Robert. If Robert had applied for title solely in his own name, he could have intended to give the whole car to Mary, and, if he only applied for a joint title, he still could have given the whole car to her. That he signed an application for joint title is one fact among many to consider in deciding if he gave her the whole car, and that is all it is. With respect, this notion that the law will not allow him to apply for title in his own name while intending to give the entire car to his wife is nonsense. As Judge Torpy himself wrote: “[Robert] could not gift the car to his wife before he owned it.”
The majority manages to conclude that the only evidence of words used by Robert manifesting an intent to make a gift is the application for title by sua sponte declaring Robert’s actual words to be inadmissible evidence. To make this true, they have to eliminate Robert’s testimony that he intended to make a gift of the car to Mary. This is done by relying on Johnson v. Deangelo, 448 So.2d 581, 582 (Fla. 5th DCA 1984), where we said that the reason why a purchaser caused his name to be on the title of a car is “legally immaterial.” Fatal to this argument is the fact that this testimony came into evidence at trial without any objection or limitation and no suggestion in the record that the jury could not or even should not consider his testimony of intent to give the car to Mary. In any event, under Deangelo, his statements are only inadmissible to show why Robert took title. They are still admissible to show what disposition he intended to make of the car, i.e., that he intended to give the car to Mary.
The second problem with the HAC theory is that it assumes the only way to “give effect” to the purchase documents, including the application for title, is to conclude that the law will not allow Robert to both *148 sign an application for title and intend to make a gift of anything more than half of the car to Mary. This notion might hold some water if the documents had any gift-memorializing purpose, but they did not. The purpose of the documents was to effect a sale of the car by the dealer and that was done.
Narrow though the majority’s HAC theory is, it is also dubious. First of all, let us be clear that nowhere in the record does Robert ever say he only intended to give Mary a co-ownership interest in the car, only that he intended to give her “the car.” Moreover, the majority’s decision that the law will not hear him to say he gave her the whole car depends on the assumption that Robert’s gift was made simultaneously with the execution of the purchase documents. This is really the oddest part of the majority opinion. Obviously, Robert could have gone in, paid for the car, applied for any kind of title he wanted, and then one hour, two hours— even fifteen minutes — later, he could form the intent to give Mary the car, then do exactly as he did (turn over possession and relinquish control), and there would be no problem. Even the majority would have no argument that the title application was conclusive proof he only intended to gift his half interest. It is only because he executed the title application in the same moment he had the intent to give the car to Mary that any such intent is deemed obliterated by the signature on the application. The majority simply will not allow Robert to intend a gift of the whole car and sign that title application at the same time. Leaving aside the question, “why not?,” this appeal begs the question, “where does this simultaneousness come from?” Not surprisingly, the majority blames it on Robert. If you refer back to that “inadmissible” testimony of Robert:
[The] salesman filled out the paperwork, gave me the paperwork, and I signed it. My intention was to buy a gift for my wife so that she could drive a car and, of course, that was my interest, was to buy her a car for that purpose. And so I signed the documents there so that I could purchase that car for her.
(Emphasis added). The majority has decided that this testimony ineluctably means that Robert intended to give her the car at the moment that he signed the title application, and the gift was complete the moment he signed the title.
Why would this language have only one meaning as a matter of law? If I say I raised my garage door so that I could get my car out of the garage, I do not necessarily mean that I drove my car out the minute I raised the door. I may do it later; I may even change my mind about taking the car out. The statement simply describes a predicate act. “I signed the documents there so that I could purchase that car for her” certainly can mean that Robert had an ongoing donative intent that survived the moment he signed the application. Perhaps if this theory had ever been mentioned below — say, in the trial — Robert could have cleared up the majority’s confusion about the duration of his intent.
Apart from the problem with the language, it is highly unlikely that the gift was simultaneous with the execution of the purchase documents. A gift has three components to satisfy: intent to give, possession and relinquishment of dominion and control. Mary only got the gift when Robert gave her possession of the car and relinquished all control. Merely signing the application for title could not accomplish the gift. Robert could have stood up, refused to write the check or take possession of the car and left, leaving Mary with no interest in any car.
*149 Because of the limited record, we do not know exactly when the gift was complete; it may have been when they drove away from the dealership, it may have been after he washed it for her the next day. The moment of the gift’s completion is not and never was an issue in this case. One thing is for sure — Robert’s filling out the dealership’s purchase documents, including the title application, did not complete the gift because, even if his intent was fixed, the remaining elements had not been met. All that matters for purposes of the jury’s verdict is that the gift was complete before the accident.
It is telling that in order to construct a reversal, the majority has to eliminate Robert’s oral testimony concerning his intent to give the car to Mary and infuse the title application with the characteristics of a gift-giving instrument that makes a gift to Mary of only half of the car. However, because no particular words — or, indeed, any words at all are essential to the giving of a gift, and because the jury could still find that Robert gave Mary the whole car (or his other half of the car — whatever) at any point after they executed the documents, this case should be affirmed. However, in the event the Florida Supreme Court takes jurisdiction of this case and hopefully moves beyond the HAC theory, it is necessary to address the Appellant’s arguments.
According to Bowen’s analysis of selected cases, the only persons who can overcome the presumption of liability under the dangerous instrumentality doctrine are title owners who establish that they possess “mere naked title” by showing that: (1) the title is held for security purposes, as in a conditional sale; or, (2) the title is only intended to be held temporarily, as where a transfer of title is in process but not completed. Bowen reasons that, because there was no evidence indicating that there had been a conditional sale between Robert and Mary, or an incomplete transfer of title, as a matter of law, Robert could not avoid liability.
In support of this argument, Bowen draws a negative inference from cases where Florida courts have recognized exceptions to the dangerous instrumentality doctrine based on incomplete transfers of title or conditional sales. For example, in Palm Beach Auto Brokers v. DeCarlo, 620 So.2d 250 (Fla. 4th DCA 1993), a used car dealer at the time of the accident had sold the car, but held title to the vehicle as security for payment of the purchase price. The court determined, however, that there was no evidence from which the court reasonably could infer that the dealer exercised dominion and control over the automobile after its sale so as to be hable as owner for damages arising from negligent operation of the automobile by the purchaser that resulted in injuries to the third party. In Palmer, the court held that where legal title to an automobile remained in the seller under a conditional sales contract, but beneficial ownership had been transferred to the buyer prior to the accident, liability for negligent operation of the automobile was not imposed on the seller under Florida’s dangerous instrumentality doctrine since the seller held “mere naked title.” The Palmer court observed that the evidence was sufficient to show the intention on the part of both the buyer and the seller to make immediate transfer of the beneficial ownership of the automobile to the buyer when the buyer took possession of the automobile. The test is beneficial ownership, not conditional sale.
For its conclusion that “temporary” title is another exception, Bowen cites to Carrasquera v. Ethan’s Auto Express, Inc., 949 So.2d 228 (Fla. 3d DCA 2006), where the auto dealership that employed the buyer of *150 the vehicle from a third party agreed to hold title as a device to allow the employee to postpone paying sales tax for thirty days. The court undertook a classic “beneficial ownership” analysis, finding that the dealership did not possess, maintain or control the vehicle and, thus, could not be liable as the owner. The court never suggested that the temporary nature of its title was dispositive.
No court has pegged conditional sales as the key fact; the key is just what the cases identify: lack of beneficial ownership. After all, there are other ways to secure a sale other than by retaining title. There is no reason why a seller who holds title for his own protection should be protected — or the seller in Carrasquero, who retained title as a ploy to defer the buyer’s sales tax liability, should be insulated — in preference to anyone else who transfers beneficial ownership. The reason for not relinquishing title is beside the point; the issue is whether there was beneficial ownership left in the seller, or not.
Boweii and the majority want to sidestep the rule of beneficial ownership by relying on a line of cases involving the purchase of an automobile for a minor to drive that imposes vicarious liability even though the record title holder professed no beneficial ownership. They principally rely on Metzel v. Robinson, 102 So.2d 385 (Fla.1958). In that case, Metzel’s minor nephew, Bryant, who lived with her, was involved in an accident while operating an automobile that was titled in Metzel’s name. At trial, Metzel contended that she was not the beneficial owner of the car, and she could not, therefore, be held liable under Florida’s dangerous instrumentality doctrine for the damages caused by Bryant’s accident. To support her position, Metzel presented evidence that Metzel signed the finance papers and took title to the automobile in her name only because Bryant could not finance the purchase of the automobile due to his age. Bryant kept up the payments and Metzel had nothing to do with the car, except that she insured the car in her name. The trial court ruled, as a matter of law, that Metzel was the owner of the automobile for purposes of applying Florida’s dangerous instrumentality doctrine. On appeal, the supreme court affirmed, observing:
[Metzel] was still in a position to exert some dominion and control over the vehicle. Certainly both appellant and her nephew had a species of ownership and either or both of them could have been held liable for the accident.
Id. at 386.
In Hertz Corp. v. Dixon, 193 So.2d 176 (Fla. 1st DCA 1966), the operator, Dixon, was a minor, and in order to enable him to purchase an automobile his brother-in-law, Gibbs, signed a conditional sales contract and took possession of the vehicle titled in the names of both Dixon and Gibbs. Dixon had possession of the car at all times and was later involved in a collision with an automobile owned by Hertz. Hertz sought to hold both Gibbs and Dixon liable. The trial court refused to enter judgment against Gibbs, holding that mere co-ownership did not impose tort liability. However, upon review, the First District Court reversed:
Here, not only was Gibbs one of the record title holders, but in fact had put in motion and made possible the operation of the automobile by Dixon, who, as a minor, could not have bought the automobile. Not only did Dixon operate the car as a co-owner, but with the knowledge, consent and direct participation by Gibbs in the acquisition of title. *151 and his position as a record holder of the title, made him hable for any damages resulting from Dixon’s operation of the automobile.
*150 [[Image here]]
Suffice it to say, that under the facts of this case the activities of Gibbs, his execution of the conditional sales contract,
*151 Id. at 177. Again, the court considered both the fact that Gibbs’s name was on the title to the vehicle and his involvement with the vehicle to decide whether he was the beneficial owner of his brother-in-law’s vehicle or whether he held mere naked title. The court focused upon the fact that Gibbs had enabled Dixon to gain possession of a vehicle by executing the sales contract, yet the court also noted that Gibbs’s “activities,” along with his position as record holder of the title, required that he be held liable under Florida’s dangerous instrumentality doctrine.
Lastly, in Pennsylvania National Mutual Casualty Insurance Co. v. Ritz, 284 So.2d 474 (Fla. 3d DCA 1973), the plaintiff was involved in an automobile accident with Dennis Ritz, a minor. Dennis was operating a vehicle registered in the name of his father, John Ritz. At trial, John Ritz was held vicariously liable for the negligence of his son based on the following evidence:
The evidence before the trial court showed that at the time of the accident Dennis Ritz did not live with his father. Moreover, Dennis operated and retained exclusive control over the Plymouth, made monthly payments on the vehicle, and paid the premiums to Glen Falls, which has admitted coverage, for the insurance on the car. The son was unable to purchase the automobile in his own name, since he was a minor; therefore John Ritz signed the conditional sales agreement and papers for him.
In rejecting the argument that the father possessed “mere naked title,” the Third District Court summarily cited to Hertz and Metzel, relying on the reference to the adult purchasing the car for the minor who could not otherwise have purchased the vehicle.
Far from representing a firm rule of vicarious liability, tempered only by the two exceptions of conditional sale and incomplete transfer of title, cases like Met-zel, Dixon and Ritz are, themselves, using the vernacular of Appellants, an “exception” to the rule of beneficial ownership. In truth, these cases appear to represent a unique category of cases where the actions of an adult in making a purchase, taking title, insuring a vehicle or taking a similar action that makes it possible for a minor to operate the vehicle will prevent the adult from avoiding legal responsibility based on a claim of “bare naked title.” In part, this outcome appears to be based on the notion that the purchase-price-supplying, financing, title-owning, vehicle-insuring adult has a measure of control over the minor driver or the vehicle and may properly be liable for the injuries caused by the dangerous instrumentality. Or, it may simply be a species of estoppel whereby the adult who, by taking title, has made it possible for the minor to operate the vehicle will not be heard to deny financial responsibility.
Bowen’s dual-exception theory also simply cannot be squared with other Florida case law. The rule is well described in 4A Florida Jurisprudence 2d, Automobiles and Other Vehicles, section 743 (2010): *152 Contrary to the view of the majority that the case before us is indistinguishable from Metzel, it is very unlike Metzel. This case is more like Plattenburg v. Dykes, 798 So.2d 915 (Fla. 1st DCA 2001), a decision that applies the relevant analysis of “beneficial ownership” in a clear-eyed way and reaches the same result that the trial court reached in this case. There, the owner, Evans, told Dykes that he would give him the vehicle if Dykes would remove it from the driveway. Evidence of intent to make this gift included leaving the keys, the owner’s manual and documents in the car and cancelling his insurance. He never signed over the title to Dykes before Dykes was involved in an accident “several days later,” however. The Plattenburg Court said that Evans’s gift was complete, that beneficial ownership had passed to Dykes, and that Evans’s failure to complete the title transfer could not, standing alone, support a finding of vicarious liability. Id. at 916-17. Evans had transferred his beneficial interest, and that was enough to avoid liability.
*151 As a general rule, the possession of naked legal title to a motor vehicle is not determinative of its ownership when considering the question of tort liability.... Rather, only a beneficial ownership of or interest in a motor vehicle, with the right of control and authority over the use of the vehicle, is determinative of the question as to which party is to be held liable as owner for a tort committed by another person’s operation and use of the vehicle.
*152 Bowen attempts to square Plattenburg with its “only two exceptions” theory of liability by suggesting that Plattenburg is an example of its “incomplete transfer” exception. But transfer was “incomplete” only in the sense that it had not been done. The title transfer in this ease is no more (or less) incomplete than the one in Plat-tenburg. In neither case was it commenced, and in neither case does that fact create dangerous instrumentality liability for the negligent acts of the person having beneficial ownership. The outcome in Plattenburg would not have been different if the accident involving the new owner, Dykes, had happened twenty-two months after Dykes had taken possession of the car and had exercised exclusive beneficial ownership of the vehicle. In Plattenburg, as in this case, the failure to execute the title transfer would be a relevant fact on the issue of beneficial ownership, but not dispositive as a matter of law.
Similarly, in Wummer v. Lowary by Lowary, 441 So.2d 1151 (Fla. 4th DCA 1983), the facts established that Wummer refinanced the repossessed Camaro of one of her employees. She then deducted the monthly payments from the employee’s paycheck, and the employee maintained control over the car. Lowary was injured while a passenger in the Camaro and sued Wummer as the owner of the vehicle. The trial court entered summary judgment in Lowary’s favor and Wummer appealed. Upon review, the Fourth District Court reversed:
Beneficial ownership carries with it liability for damages which arise from an automobile’s negligent operation. Wum-mer’s employee had sole possession of the auto. Wummer saw it for the first time after the accident occurred. She was not the beneficial owner of the Ca-maro. Accordingly, we reverse the order granting Lowary’s and denying Wummer’s motion for summary judgment.
Id. at 1151-52 (citations omitted).
The trial court properly concluded that beneficial ownership of a vehicle is key to vicarious liability, and that the determination whether a title holder possesses mere naked title or is the beneficial owner of the vehicle hinges on the evidence concerning whether the title holder had control and authority over the use of the vehicle. If the evidence establishes without dispute that the title holder has beneficial use of the vehicle, then the trial court is authorized to rule, as a matter of law, that the title holder is liable under the dangerous instrumentality doctrine. See Cox Motor Co. v. Faber, 113 So.2d 771 (Fla. 1st DCA 1959). Otherwise, the question of benefi *153 cial ownership must be submitted to the jury, as was done here.
The real problem in this case is that the majority (and Bowen) want title alone to be dispositive. That argument was considered and correctly rejected by the Florida Supreme Court in Palmer:
It is evident from a reading of Section 319.22 in its entirety that the primary emphasis intended by this section is upon the marketability of title to a vehicle. Appellant contends, however, that one who has not complied with the provisions of this section has not succeeded in divesting himself of ownership of the vehicle, with the result that tort liability growing out of such interest may successfully be asserted against him. The source of this contention is to be found in F.S.A. § 319.22(2) which provides that an owner who has sold and delivered a vehicle to a purchaser ‘shall not by reason of any of the provisions of this law, be deemed the owner of such vehicle so as to be subject to civil liability for the operation of such vehicle thereafter by another’ when the owner has fulfilled either of two specified requirements pertaining to endorsement and delivery of the title certificate, which appellant contends R.S. Evans has not complied with. The provisions of this section have been construed in Ragg v. Hurd, Fla., 60 So.2d 673, Rutherford v. Allen Parker Co., Fla., 67 So.2d 763, and Platt v. Dreka, Fla., 79 So.2d 670, opinion filed April 6, 1955. In the Ragg and Platt cases, supra, this court was careful to point out that Chapter 319, Florida Statutes, did not provide an exclusive method of transferring title nor abrogate the common law of sales. By putting these decisions together, the true import of Section 319.22(2) as it affects the possible tort liability of the seller of an automobile is brought into focus. While it is clear that under this section no civil liability can accrue to a seller who has complied with the title certificate requirements, it does not necessarily follow that a seller who does not comply with these requirements is ipso facto liable. This is true because the common law of sales is available to test the liability of a non-complying seller. We therefore turn to examine the evidence which was submitted upon the issue of ownership, to determine whether under the common law the jury was authorized to return a verdict exonerating R.S. Evans.
81 So.2d at 636. This is a sensible application of the statute that has avoided much unfairness. To paraphrase what the high court said in Palmer, here, the relevant inquiry is whether “the definite intention existed on the part of [Robert] to make immediate transfer of the beneficial ownership of the vehicle to [Mary].” Id.
Robert’s failure to take action to remove his name from the title is a fact that the jury may consider in deciding whether he did not intend to divest himself of a beneficial ownership and, therefore, that he was, in fact, an owner, but it does not mean “as a matter of law” that he had beneficial interest. At the end of the day, he only had title, and mere title is not enough to make him liable.[13]
SAWAYA and PALMER, JJ. concur.

. Appellants have provided a very abbreviated record on appeal. It consists of counsels’ pre-trial discussions regarding the admission of certain evidence, opening statement and closing argument of Robert only, the testimony of a homicide detective, portions of the testimony of Mary, Robert and a physician's deposition. It appears the only evidence in the record on appeal concerning the issue of Robert's liability is an excerpt of Robert’s trial testimony. Robert testified that he formerly had been married to Mary, but the couple separated in April 1999, and Mary had relocated to Brevard County. In April 2003, after the conclusion of the court proceedings for the dissolution of their marriage, he wanted to reconcile with Mary, and he travelled some 500 miles from his home in the Florida Panhandle to visit her. Mary told him that she needed a second car. After shopping around, "he bought her a car” — the PT Cruiser that Mary was operating at the time of the fatal accident. Robert testified that his intention was to buy the car as a gift for Mary, and they both signed all the paperwork at the dealership when the purchase took place. He "signed the documents there so that [he] could purchase that car for her.” The following morning, he went to Mary’s residence, and she took him to the basement where the car was parked. He took the PT Cruiser to a car wash, got it cleaned up for her and took it back to her. In the ensuing two years, he was never behind the wheel again, and he had only laid eyes on it one other time, in the summer of 2003 when he saw it in her garage. He testified that he never had access to the car, never had any authority over the car, had no access to the garage where it was kept, never had a key to the car, never insured it, and it was never registered in his name. All of this testimony was admitted without objection.

. In Bowen’s motion for entry of judgment in accordance with the motion for directed verdict, she asserted that Robert was liable as a matter of law (1) because he had not taken steps to remove his name from the title (2) because of lack of control over the vehicle was legally irrelevant, (3) because Florida only allows the absence of beneficial ownership in cases involving incomplete or temporary transfers of title or conditional sales, and, finally, (4) because his name was on the title, he necessarily had the right to control the vehicle.

. I suggest that the correct question to certify to the Florida Supreme Court is not the one posed by the majority; rather, it should be:
May a person who intentionally directs that title be issued in his name as co-owner, by completing a sworn application for title in conjunction with the purchase of the automobile, avoid liability under the dangerous instrumentality doctrine by giving the car away?